[No. S010242. July 9, 1990.]

In re DAVID G. NANEY on Disbarment.

COUNSEL

David A. Clare for Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., Margaret E. Fourt and Starr Babcock for Respondent.

OPINION

THE COURT.—We review the recommendation of the State Bar Court Review Department (review department) that petitioner David G. Naney be disbarred from the practice of law in this state. This recommendation is based on petitioner's conviction of three misdemeanor counts (see Pen. Code, § 17, subd. (b)(4)) of grand theft (Pen. Code, § 487, subd. 1) for misappropriation of entrusted funds, and on petitioner's subsequent conduct in misrepresenting his academic qualifications and failing to disclose his interim suspension to a prospective employer.

The State Bar's Standards for Attorney Sanctions for Professional Misconduct provide that any willful misappropriation of funds, or any final conviction of a crime involving moral turpitude, shall result in disbarment unless "the most compelling mitigating circumstances clearly predominate." (Rules Proc. of State Bar, div. V, Stds. for Atty. Sanctions for Prof. Misconduct,[1] stds. 2.2(a), 3.2.) ■ Although we have described the standards as "simply guidelines for use by the State Bar" (*Greenbaum* v. *State Bar* (1987) 43 Cal.3d 543, 550 [237 Cal.Rptr. 168, 736 P.2d 754]), and have repeatedly affirmed that they are not binding on us (e.g., *Coombs* v. *State Bar* (1989) 49 Cal.3d 679, 697 [262 Cal.Rptr. 554, 779 P.2d 298]; *Gary* v. *State Bar* (1988) 44 Cal.3d 820, 828 [244 Cal.Rptr. 482, 749 P.2d 1336]), nevertheless we recognize that adherence to the standards in the great majority of cases serves the valuable purpose of eliminating disparity and assuring consistency, that is, the imposition of similar attorney discipline for instances of similar attorney misconduct. (See *In re Young* (1989) 49 Cal.3d 257, 267, fn. 11 [261 Cal.Rptr. 59, 776 P.2d 1021] [". . . the State Bar Court should follow the guidance of the Standards for Attorney Sanctions whenever possible to help ensure greater consistency in disciplinary sanctions for similar offenses."].) Accordingly, we give the standards great weight (*Van Sloten* v. *State Bar* (1989) 48 Cal.3d 921, 933, fn. 6 [258 Cal.Rptr. 235, 771 P.2d 1323]; *Segal* v. *State Bar* (1988) 44 Cal.3d 1077, 1087 [245 Cal.Rptr. 404, 751 P.2d 463]), just as we give a disciplinary recommendation of the review department great weight (*In re Demergian* (1989) 48 Cal.3d 284, 293 [256 Cal.Rptr. 392, 768 P.2d 1069]). Where, as here, the review department's recommendation is consistent with the standards, we will reject the recommendation only if we entertain grave doubts as to its propriety. (*In re Rivas* (1989) 49 Cal.3d 794, 800 [263 Cal.Rptr. 654, 781 P.2d 946]; *Lawhorn* v. *State Bar* (1987) 43 Cal.3d 1357, 1366 [240 Cal.Rptr. 848, 743 P.2d 908].)

Petitioner contends that in his case the aggravating circumstances found by the review department are not egregious enough to support a disbarment recommendation, that the mitigating circumstances are compelling and clearly predominate, and that the recommended discipline is excessive given all the circumstances of the case.

We conclude that the record fully supports the review department's finding of aggravating circumstances, that petitioner has not established that the most compelling mitigating circumstances clearly predominate, and that the recommended discipline is warranted. Accordingly, we shall adopt the review department's disbarment recommendation.

---

[1] All further references to standards are to these provisions.

## FACTS

Petitioner was admitted to the State Bar in December 1977; he has no prior record of discipline. Petitioner entered a nolo contendere plea on May 20, 1986, to three misdemeanor counts of grand theft (see Pen. Code, §§ 17, subd. (b)(4), 487, subd. 1, 489). We placed petitioner on interim suspension, commencing August 29, 1986, and we referred the matter to the State Bar for hearing, report, and recommendation of the appropriate discipline.

### A. *Facts Underlying the Convictions*

The facts on which the convictions were based are not in dispute. Between March 1985 and April 1986, petitioner, as appointed counsel for three indigent clients in capital cases, applied to the court for funds to pay investigators, experts, and others in connection with the preparation and presentation of his clients' defenses (see Pen. Code, § 987.9). The applications were granted and petitioner received a total of $35,500 in government funds, which he placed in three client trust accounts.

Through a series of withdrawals from these client trust accounts, petitioner misappropriated for his personal use a total of $17,950. To make a deposit on an apartment, petitioner withdrew $650 in April 1985. To pay for charges on his credit card for personal expenses and for business expenses unrelated to the capital cases, petitioner made withdrawals totaling $8,300 in August 1985 and January 1986. To discharge Internal Revenue Service tax liens, petitioner made withdrawals totaling approximately $9,000 in the period January to March of 1986.

An investigator working for petitioner reported to the district attorney's office that there appeared to be something seriously wrong with petitioner's handling of the entrusted funds. Upon learning that the district attorney's office had commenced an investigation, petitioner promptly withdrew from representation in the two capital cases that were still pending and rendered an accounting in all three cases. After his conviction by plea of nolo contendere, petitioner was granted probation conditioned on serving a short jail term and performing 1,000 hours of community service.

### B. *Mitigating Circumstances*

At the initial disciplinary hearing, petitioner presented evidence establishing the following mitigating circumstances, which are not now disputed by the State Bar.

After his admission to the practice of law in 1977, petitioner worked for a law firm in Los Angeles for two years before moving to Bakersfield, his

hometown, and establishing himself as a sole practitioner. At first his practice was divided evenly between civil law, which included representing clients in the oil industry, and criminal matters, which consisted mostly of representing indigent defendants by court appointment, but petitioner's criminal law work gradually increased until it accounted for 95 percent of his practice. Petitioner enjoyed trial work and achieved a good reputation in the local legal and judicial community for his honesty, trustworthiness, and legal skills, as evidenced by his appointment, on several occasions, to sit as a temporary judge (see Cal. Const., art. VI, § 21).

To resolve problems in his marriage, petitioner began seeing a psychologist in 1983. Petitioner saw one psychologist for six months to a year and a second psychologist for over a year. Petitioner had hoped that his health insurer would pay for the psychologists' services but the insurer denied his claim. Petitioner had an unpaid balance with the second psychologist of $6,250. Petitioner's marital problems were not resolved and in April 1985 his wife asked him to leave the family home. He moved out and rented an apartment, using funds misappropriated from one of the trust accounts to make the deposit.

In November 1984, petitioner purchased a house that had been converted to offices. He established his own law office in this building with the intention of renting the remaining office space. The purchase was a severe financial strain on petitioner and rental income was essential[2] One attorney rented space in petitioner's building for four months, then stopped paying rent and moved out. A second individual, who had been practicing law in the Bakersfield area for several years, then rented the space but it turned out that this person had never been admitted and was practicing law illegally. Although petitioner had only a landlord-tenant relationship with this individual, petitioner lost 40 to 50 percent of his remaining civil clients as a result of the adverse publicity caused by this incident.

Other factors contributed to petitioner's steadily worsening economic situation. A depression in the oil industry in the Bakersfield area caused petitioner to lose some of his civil clients. Payment for representation of indigent clients by court appointment was sometimes not received until months after the case was concluded. The Internal Revenue Service was

---

[2] Although petitioner testified, and the hearing panel and review department found, that he "purchased" the building and that the purchase was a great financial strain, this testimony appears to be inconsistent with statements petitioner made when interviewed by an investigator for the district attorney's office as part of the criminal investigation. During the interview, a transcript of which was received in evidence at the State Bar hearing, petitioner stated that the business property, although in petitioner's name, was owned by his father because "he put the money into it." Petitioner was never asked about this apparent discrepancy.

pressuring petitioner to pay his 1983 federal personal income tax by threatening to place a lien on the home in which his wife and their two children continued to live.

Petitioner exacerbated these already serious problems by his carelessness and extravagance. According to petitioner's own testimony, he "never really looked at the checkbook, other than to sign checks." He had once used 10 or more credit cards but gradually lost all but 1 of them through late payment of the balance due. He was able to retain his last credit card only by making payment with funds misappropriated from his trust accounts. Despite his precarious financial condition, petitioner was paying $600 monthly to lease a Mercedes Benz automobile for his estranged wife.[3]

Petitioner always intended to reimburse the trust accounts for the misappropriated funds; he wrote "to be reimbursed" or "pay back" in the check registers for the accounts when he made the improper withdrawals. Petitioner competently represented the defendants in the three capital cases for which he received expense funds and none of these defendants was injured by the misappropriations. Petitioner fully cooperated with the district attorney's office throughout its investigation of the misappropriations. During the investigation petitioner made prompt and full restitution with the aid of a loan from his parents.

At petitioner's request, Dr. Kenneth Weisbrod, a psychologist, performed a psychological evaluation of petitioner. Dr. Weisbrod testified that at the time of the misappropriations petitioner was under unusual stress caused by a heavy trial schedule, marital disharmony, and economic difficulties. The body of a person under heavy stress may become chemically unbalanced, resulting in impaired judgment and distortion of the person's value system; this appears to be what happened in petitioner's case. It was Dr. Weisbrod's opinion that petitioner would not pose a significant risk of harm to the public if permitted to again practice law, but Dr. Weisbrod recommended that petitioner have continued psychological therapy for several years to improve his ability to respond appropriately in stressful situations.

C. *Aggravating Circumstances*

About one week after the initial hearing in this disciplinary proceeding, and while he was on interim suspension, petitioner replied by letter to a

---

[3]During the period when the misappropriations were occurring, petitioner purchased a Mexican cruise for his secretary and went on a vacation to Hawaii with his girlfriend. Petitioner testified, however, that his secretary fully reimbursed him for the cost of the cruise and that his girlfriend paid all the expenses of the Hawaiian vacation.

newspaper advertisement for a position with a multiemployer pension trust fund. The position was described as "attorney in-house" to manage the fringe benefit collection department. Petitioner included with his response a copy of his resume stating that he had a master's degree in taxation. Petitioner knew this statement was untrue; he had earned only five of the sixteen credits required for the degree. The resume also stated that petitioner had been admitted to practice law in 1977. Neither the resume nor the accompanying letter stated that petitioner was then unable to practice law by virtue of the interim suspension. Petitioner was granted an interview for the position and failed to reveal during the interview that he was suspended from the practice of law.

In testimony at a later hearing in this matter, petitioner explained that he had acted on the advice of a resume service in falsely claiming to hold a master's degree; petitioner further explained that he had not revealed his interim suspension because he did not believe the duties as described in the advertisement required the practice of law and because during or shortly after the interview, when he realized that the position's duties did involve the practice of law, he made an uncommunicated decision not to accept the position if offered.

### D. *Proceedings and Recommendations*

The hearing panel, consisting of a single referee, initially concluded that compelling mitigating circumstances predominated in this case and recommended discipline less than disbarment, including two years of actual suspension from the practice of law. Thereafter the hearing panel granted the hearing examiner's motion to present additional evidence of aggravating circumstances occurring after the initial hearing. After receiving and considering this additional evidence, the hearing panel filed an amended decision recommending that petitioner be disbarred. In so recommending, the hearing panel said it could no longer conclude, as it had in its initial decision, that petitioner was sincerely remorseful or that his misappropriations were aberrational. The hearing panel stated that the evidence in aggravation made petitioner's assertions of remorse "sound very hollow" and that "it is clear that the good reputation [petitioner] previously established cannot be relied upon as [a] guide to his future conduct."

Petitioner sought review of the hearing panel's amended decision. By a vote of 15 to 1, the review department adopted the hearing panel's findings, conclusions, and discipline recommendation as stated in the amended decision.

## DISCUSSION

 We consider first petitioner's contention that the finding of aggravating circumstances does not support the disbarment recommendation. Petitioner concedes that his conduct in misrepresenting his academic qualifications and in failing to disclose his interim suspension "was not admirable," but he argues that this conduct was not sufficiently egregious to support a disbarment recommendation. In particular, he maintains: (1) falsely claiming to have a master's degree in taxation was not egregious because the job for which he was applying did not involve tax work; (2) failing to disclose his interim suspension was not egregious because he honestly and reasonably believed when he first applied that the position did not involve the practice of law and he resolved not to accept the job if offered when he learned that it did or might involve the practice of law; and (3) the discipline imposed for similar acts in the past has been reproval, indicating that such acts cannot be used to support the discipline of disbarment.

The standards provide that one of the circumstances that "shall be considered aggravating" is "that the member's misconduct was surrounded or followed by bad faith, dishonesty, concealment, overreaching or other violations of the State Bar Act or Rules of Professional Conduct . . . . " (Std. 1.2(b)(iii).) Petitioner's conduct in falsely representing to a prospective employer that he held a master's degree in taxation is plainly an act of dishonesty that followed the misconduct resulting in the grand theft convictions; accordingly, this act of dishonesty must be considered as an aggravating circumstance in determining the appropriate discipline.

 An attorney on suspension is barred not only from practicing law but also from holding himself or herself out as entitled to practice during the suspension period. (Std. 1.2(h); *Arm* v. *State Bar* (1990) 50 Cal.3d 763, 775 [268 Cal.Rptr. 741, 789 P.2d 922]; *In re Cadwell* (1975) 15 Cal.3d 762, 771 [125 Cal.Rptr. 889, 543 P.2d 257].) Both express and implied representations of ability to practice are prohibited. (*In re Cadwell, supra*, at p. 770.)
 By applying for a position as "in-house counsel" by means of a resume that showed he had been admitted to the State Bar but did not show he was suspended or otherwise unable to practice, petitioner impliedly held himself out as a person entitled to practice law. This was misconduct and therefore must be considered as an aggravating circumstance.

We see no need to characterize petitioner's actions as "egregious" or "nonegregious," or to determine what would be the appropriate discipline for these acts considered in isolation. For our purposes, it is sufficient at this point to note that the evidence establishes significant aggravating circumstances evidencing dishonesty, poor judgment, and a lack of understanding

of petitioner's ethical and professional responsibilities. Whether the recommended discipline of disbarment is appropriate is considered below.

■ We consider next the evidence of mitigating circumstances. Some mitigating circumstances are clearly established by the record and not disputed. In particular, petitioner's misconduct did not harm his clients in the capital proceedings (std. 1.2(e)(iii)), petitioner was candid and cooperative during investigation of his misconduct in both the criminal and the disciplinary proceedings (std. 1.2(e)(v)), and petitioner's good character was attested to by the testimony of two judges and by the declarations of attorneys familiar with his misconduct (std. 1.2(e)(vi)).

■ Because petitioner had been in practice only seven years at the time of the misconduct, the absence of a prior record of discipline is not a strong mitigating factor. (See std. 1.2(e)(i); *Kelly* v. *State Bar* (1988) 45 Cal.3d 649, 658 [247 Cal.Rptr. 608, 754 P.2d 1104] [seven and one-half years without prior discipline insufficient for mitigation]; *Smith* v. *State Bar* (1985) 38 Cal.3d 525, 540 [213 Cal.Rptr. 236, 698 P.2d 139] [six years without prior discipline insufficient].) ■ Although petitioner restored the funds, he did so only after the criminal investigation began; restitution paid under the threat or force of disciplinary or criminal proceedings is not mitigating. (*Hitchcock* v. *State Bar* (1989) 48 Cal.3d 690, 709 [257 Cal.Rptr. 696, 771 P.2d 394].) ■ Nor is it mitigating that an attorney had a heavy caseload at the time of the misconduct. (*Garlow* v. *State Bar* (1988) 44 Cal.3d 689, 711 [244 Cal.Rptr. 452, 749 P.2d 1307].)

■ While we have held that financial difficulties may be considered in mitigation (*Amante* v. *State Bar* (1990) 50 Cal.3d 247, 254 [266 Cal.Rptr. 648, 786 P.2d 375]), some financial pressures are present in virtually all cases of misappropriation and the weight to be given this factor depends upon the facts of the particular case. We give financial pressures greater weight in mitigation if they are extreme and result from circumstances that are not reasonably foreseeable or that are beyond the attorney's control.

■ Here petitioner attributed his financial difficulties in part to delays in payment for court-appointed representation and a downturn in the oil industry resulting in a reduction of his oil-related civil practice, but these are the kinds of routine problems normally encountered by many, if not most, attorneys. The only truly unforeseeable circumstance shown by the evidence was adverse publicity resulting from petitioner's having rented office space to an individual engaged in the unauthorized practice of law. We note, however, that petitioner never documented an actual decline in his yearly income. Moreover, the record indicates there were other causes of petitioner's financial difficulties that were not unforeseeable or beyond

petitioner's control. Petitioner never explained why in 1985 he had still not paid his 1983 federal income taxes, he testified that he did not look at his checkbook except to write checks, he admitted leasing an expensive automobile for his estranged wife at a cost of $600 monthly, and he did not testify to any steps he took to reduce his spending or to resolve his financial problems by legal means. Thus petitioner's financial problems appear to have been caused in large measure by his own carelessness and extravagance.

Petitioner also testified that he experienced marital difficulties and separated from his wife during this period. ■ Marital difficulties can be considered in mitigation (*In re Demergian, supra*, 48 Cal.3d at p. 294), but emotional distress resulting from marital difficulties and similar problems is not mitigating absent evidence that it was directly responsible for the misconduct (see std. 1.2(e)(iv)). ■ We find little evidence in petitioner's testimony that the marital problems caused him severe emotional distress or were directly responsible for the misconduct. Dr. Weisbrod's testimony, to the effect that stress can cause impaired judgment and distortion of values, fell somewhat short of establishing that petitioner's marital difficulties caused the misappropriations.

While it is to petitioner's credit that he sought psychological services to resolve his marital problems, the fact that his misappropriations occurred after two years of weekly sessions with a psychologist suggests either that marital problems did not cause the misconduct or that petitioner's psychological problems are so serious that extended and intensive therapy is necessary. ■ A psychological disorder that has caused or contributed to misconduct is mitigating only if the attorney establishes rehabilitation; in other words, the attorney must show that he has so overcome or controlled the disorder that it is unlikely to cause further misconduct. (See *In re Billings* (1990) 50 Cal.3d 358, 367 [267 Cal.Rptr. 319, 787 P.2d 617]; *In re Lamb* (1989) 49 Cal.3d 239, 246 [260 Cal.Rptr. 856, 776 P.2d 765].)

## CONCLUSION

Petitioner has committed misconduct for which disbarment is the usual and appropriate discipline. While mitigating circumstances are present, aggravating circumstances have also been shown. We conclude that petitioner has failed to establish that the mitigating circumstances are compelling and clearly predominate. Accordingly, we adopt the review department's recommendation as to discipline.[4]

---

[4]Petitioner will be eligible to apply for reinstatement on August 29, 1991, five years after the effective date of interim suspension. (See Rules Proc. of State Bar, rule 662.) We express no view on whether petitioner should be reinstated at that time.

David G. Naney is disbarred from the practice of law and his name is stricken from the roll of attorneys. This order is effective upon finality of this decision in this court. (See Cal. Rules of Court, rule 24(a).)